# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| LAMAR AGARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO.  4:16CV443 HEA |
| | ) | |
| MALLINCKRODT ENTERPRISES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion for Summary

Judgment, [Doc. No. 42].  Plaintiff opposes the motion and has filed a written

response thereto, to which Defendant has filed a reply.  For the reasons set forth

below, the Motion will be granted.

### Facts and Background

Defendant has, in accordance with the Court's Local Rules, submitted a

Statement of Uncontroverted Material Facts.  Although Plaintiff has filed a

response to Defendant's Statement, he fails to support his denials with any specific

references to admissible evidence in the record.  Pursuant to Rule 56 of the Federal

Rules of Civil Procedure and Rule 7-401(E) of this Court's Local Rules,

Defendant's facts are therefore deemed admitted. Local Rule 7-401(E) provides:

Rule 7 - 4.01 Motions and Memoranda.

(E) A memorandum in support of a motion for summary judgment shall have attached a statement of uncontroverted material facts, set forth in a separately numbered paragraph for each fact, indicating whether each fact is established by the record, and, if so, the appropriate citations. Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine issue exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts. All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.

## Facts and Background

Mallinckrodt Enterprises, LLC ("Mallinckrodt") is a specialty pharmaceutical company that develops, manufactures, markets, and distributes specialty pharmaceutical products.

Plaintiff Lamar Agard ("Agard") is an African American male who was hired by Mallinckrodt's predecessor, Covidien, on January 14, 2013, as a Senior Treasury Manager, Cash Management in the Finance Department. As a senior treasury manager, Agard was responsible for cash management operations for the United States and Latin America, including monitoring global liquidity, authorizing payments and disbursements, ensuring payments were received, ensuring bank accounts had the correct signatories, and performing other treasury-related functions.

At the time, Covidien was preparing to spin off Mallinckrodt into a stand-alone company and, in preparation, needed to substantially staff up its Finance-

Treasury function. The intention was that Agard would continue in the Senior Treasury Manager-Cash Management role after Mallinckrodt spun off from Covidien, which he did.

Agard had initially applied, but was not selected, for the Director of Risk Management position; he was instead offered and accepted the Senior Treasury Manager – Cash Management position. Einwalter offered Agard a Senior Treasury Manager position, despite the fact that Agard had not applied for such position. Although Agard did not have the ideal cash management background for the job, Einwalter recognized Agard had some prior treasury experience and was immediately available to join the Finance team.

In January 2013, Einwalter made the decision to hire Wescott as the Director of Risk Management. Agard did not know who besides himself and Wescott had applied for the Director of Risk Management position. Wescott had prior experience in risk management at Sigma Aldrich, a life science and biotechnology company, which gave her a subject matter background that poised her well for Mallinckrodt's area of business. Wescott was a well-respected professional in the St. Louis area in terms of risk management. Wescott had prior experience working for Covidien, which gave her unique insight into the Company's particular insurance risks. Agard had no prior experience working for Covidien.

In January 2013, Einwalter also hired Matt Mainer as Assistant Treasurer, who would be Agard's direct supervisor.

In June 2013, Mallinckrodt spun off from Covidien into a standalone company.

In August 2013, Wescott resigned from the Director of Risk Management position to accept a job opportunity at another company. Wescott's resignation occurred after the successful spinoff of Mallinckrodt, such that key initial risk management functions had already been completed by Wescott. For example, all lines of insurance had been renewed at the time of spinoff and would not have to be renewed again until June 2014. Given the current size of the Company, the slow time of year relative to risk management functions (i.e., insurance renewal), and the capacity of the existing staff to absorb Wescott's remaining duties, Mallinckrodt determined the Finance-Treasury Department did not require a full time Director of Risk Management such that it did not need to immediately fill Wescott's vacated position.

Mainer and Einwalter had prior experience managing insurance functions at their prior companies (including Einwalter at Belden, a similarly sized company, without having a dedicated Director of Insurance), so the Company believed the function could be supported by existing staff, which it was.

Knowing Agard had some prior history in risk management and had expressed an interest in the Director position, Einwalter and Mainer did give Agard the opportunity to assume some of the Director duties on an interim basis, to show he could satisfy the requirements of the position in the event the Company later recreated the position. Agard was not given all of the duties of the Director of Risk Management position and many of the duties that remained were assumed by Mainer.

At the time, Mallinckrodt did not hire *anyone* to fill the Director of Risk Management position.

In 2014 and beyond, Agard reported to Mainer who reported to Einwalter. One of the key responsibilities of the Director of Risk Management position was handling the yearly insurance renewal process; Agard was tasked with leading the process for 2014. During the June 2014 insurance renewal process, both Einwalter's and Mainer's experience with Agard was that he was not proactive, failed to timely respond to requests from insurance companies, and failed to effectively communicate with his Finance team members. Einwalter received direct feedback from the Company's primary insurance broker during the insurance renewal process that Agard was "not responsive." Mainer and Einwalter received complaints from inside the Finance Department that Agard was not timely

in responding to communications. As a result of these issues, Mainer was forced to step in and guide completion of the insurance renewal process.

Following Mainer's and Einwalter's concerns with Agard's substandard contribution during the insurance renewal process, they continued to note shortcomings regarding his performance, and reflected the same in completing his fiscal year 2014 Performance Review.

On October 23, 2014, Agard received his fiscal year 2014 Performance Review with an overall rating of "Partially Achieving" – this was the second lowest possible rating. Agard's Performance Review included, without limitation, the following negative comments:

Under the performance goal of assuming interim role of Risk Manager until Director of Risk is hired:

- "Rating: Partially Achieving"

- "On a day to day basis Lamar is responsible for claims management, loss control site visits oversight, fielding daily questions and requests including certificates of insurance, premium coordination and allocation and acquisition integration. In several of these areas I have received negative feedback about Lamar's performance including lack of visibility and communication and general lack of expected responsiveness."

- "Overall he has made some good contributions in this area, specifically becoming the primary risk management contact and assisting in a successful renewal process. Where his performance has not met expectations is lack of communication of clear deadlines and accomplishment of those deadlines. In addition there has been negative feedback regarding his responsiveness to requests in this area."

Under the performance goal of driving automation of the payment process in LATAM, significantly eliminating or reducing manual payments:

- "Rating: Partially Achieving"

- "Lamar did work with Barb Branneky to optimize as the manual payment process and support the automation within Latin America. The automation project was unsuccessful due primarily to issues between IT, KPIT, and Citibank. As the senior treasury person involved in the project, Lamar could have been more proactive to escalate issues to senior management."
-

Under the performance goals section summary:

- "Rating: Partially Achieving"

- "Areas he needs to improve on are establishing and meeting deadlines for various projects and tasks, being more proactive in driving results and finally improving his responsiveness within our department and cross functionally."

Under the development goal of assuming the risk management role:

- "Mixed results here. Opportunity to manage a major project (insurance renewal) and although overall results were good, management of the process was a little disjointed."
-

Under the cultural hallmark of being engaged:

- "Mixed results here. Lamar was engaged and willing to assume interim risk manager role which was appreciated however level of engagement was questionable at times especially given negative feedback received cross functionally on lack of responsiveness."

Under the cultural hallmark of being competitive:

- "The feedback that he lacks a sense of urgency also is not congruent with this hallmark."

Under the cultural hallmark of being collaborative:

- "Given negative feedback cross functionally about Lamar's lack of responsiveness he is failing to meet expectations in this category."

Under the cultural hallmark of being high performing:

- "Lamar's major accomplishment in 2014 was his efforts on the insurance renewal which was successfully completed on time. However this was the basic requirement and where he missed a real opportunity was taking full ownership of the process. He was a key contributor but really could have taken control and demonstrated more leadership here. In addition, feedback about his lacking the proper sense of urgency and poor responsiveness are inconsistent with our high performing culture."
-

Under the cultural hallmark section summary:

- "Rating: Partially Achieving – Individual behaviors need improvement to meet Mallinckrodt expectations on several cultural hallmarks."
- "Lamar is under performing in several key cultural hallmark areas. To receive negative feedback from within our department and cross functionally about his poor responsiveness and lack of the proper sense of urgency is disappointing."

Agard did not contest or complain about his Performance Review to Human Resources, Legal, or the Company hotline.

On October 23, 2014, Agard was also placed on a 30 Day Action Plan – Performance ("Action Plan"). The Action Plan outlined two areas within Agard's performance that needed immediate attention and improvement: (1) responsiveness and sense of urgency" and (2) "follow through and completion of requested tasks." The Action Plan stated that if measurable improvement was not achieved within the next 30 days, Agard would proceed to a formal performance improvement plan. Agard signed the 30-Day Action Plan without making any written objections.

Agard did not contest or complain about his Action Plan to Human Resources, Legal, or the Company hotline.

In December 2014, Mainer resigned to pursue a promotion to Treasurer at another company.

Following Mainer's resignation, Agard began reporting directly to Einwalter. Einwalter's concerns with Agard's performance continued into 2015, as Agard continued to demonstrate low productivity and initiative, and seemed to struggle to find his place in the Finance Department.

In 2014, Mallinckrodt underwent substantial merger and acquisition activity that fundamentally reshaped the Company. Mallinckrodt acquired two companies in 2014, Cadence Pharmaceuticals and Questcor Pharmaceuticals, which increased the size and scope of the Company, and conducted due diligence on a third company, Ikaria Inc. ("Ikaria"), which would ultimately be acquired in late-spring 2015.

Given the substantially increased size of the Company and the revised needs of the Finance Department relative to risk management, including the desire to consider higher level insurance functions (e.g. investigating enterprise-wide risk management and captive insurance opportunities), Mallinckrodt determined it was necessary to recreate a dedicated Director of Risk Management position and devote greater resources to the role.

Mallinckrodt posted the recreated Director of Risk Management position from January 6, 2015 to February 17, 2015, for both internal and external candidates. Agard never submitted an application for the recreated Director of Risk Management position, despite knowing the Company was accepting applications from both internal and external candidates. Agard never applied for the Director of Risk Management position posted in January 2015.

On March 2, 2015, Einwalter hired Mark Huddleston (Caucasian) for the position. Huddleston had over 15 years of prior experience as a Director of Risk Management. Huddleston most recently worked at Sigma Aldrich, a local life sciences company, giving him subject matter experience that poised him well for the Company's area of business. Given Huddleston's experience, Einwalter believed he was most experienced for the tasks facing the new Director of Risk Management, as the recreated Director position would have greater responsibilities than the former Director position and would require the ability to handle higher-level insurance functions.

Agard did not have the same level of experience as Huddleston. He does not even know what Huddleston's qualifications or background are. Agard was not aware of who else applied for or interviewed for the position.

Following Mainer's resignation, Mallinckrodt posted the Assistant Treasurer position on January 7, 2015 for both internal and external candidates. Agard never

applied for the posted Assistant Treasurer position.  Agard was not aware of who else interviewed for the position and did not know who was hired for the position. Einwalter ultimately hired Ravi Iyer (Indian) for the position. Agard was not aware of Iyer's qualifications, was not involved in evaluating the same, and did not know who made the hiring decision.

Mallinckrodt acquired Ikaria around April 2015.  Iyer had held the Assistant Treasurer position at Ikaria for approximately 7 years. Einwalter believed Iyer's direct experience in the role gave him unparalleled insight to serve as Assistant Treasurer of the combined companies.

Agard had no prior comparable experience.  Agard's experience as treasurer for a school board was very different in terms of "job experience" from having experience as treasurer of an international, publicly-traded company.

In 2015, Mallinckrodt was undergoing an aggressive company-wide restructuring initiative to increase value and productivity while reducing costs across every function, including the Finance Department.  As part of the restructuring, Mallinckrodt eliminated three positions from the Finance Department due to their lack of sufficient work to justify maintaining the full-time positions: (1) the Manager, Pharma Strategy & Commercialization, International position; (2) the Director, Finance and Administration position; and (3) the Senior Manager, Treasury, Cash Management position held by Agard.  Scotty Sengsavang

(Asian) held the Manager, Pharma Strategy & Commercialization, International position and Keith Huels (Caucasian) held the Director-Finance and Administration position.

Einwalter made the decision to eliminate Agard's position in consultation with Christine Williams in Human Resources. Agard's employment terminated on June 26, 2015. Agard was included because of his low productivity and performance issues, and the lack of continuing need for his role, given the ability to absorb his functions into existing Finance Department positions.

Agard has no idea what went into the decision to select his position for elimination. Agard believes his job duties continued to be performed by the Finance Department following his departure and is not aware if anyone was hired to replace him. Agard's duties were absorbed by other Finance Department staff, including any remaining insurance duties going to Huddleston (as the new Director of Risk Management) and daily cash management duties going to two Finance Department analysts who previously assisted Agard (Frank Ricchio and Elan Fredman). He was not replaced. To date, Mallinckrodt has not recreated the eliminated cash manager position.

Einwalter was not involved in any employment decision relative to John Moten or Thomas Brown; these employees never reported to him.

Mallinckrodt hired Elan Fredman on May 6, 2013 into the Finance-Treasury

Department into an analyst-level position. Einwalter selected Fredman because he believed Fredman was the most qualified for this position because of his history in finance roles at Goldman Sachs in New York as well as a spin off from Emerson Electric in St. Louis.

Mallinckrodt hired Frank Ricchio on June 22, 2013 into the Finance-Treasury Department into an analyst-level position. Einwalter selected Ricchio because he believed Ricchio was the most qualified because he had the necessary skill set, was interested, and available.

Agard filed a charge of discrimination on July 15, 2015 with the Missouri Commission on Human Rights. Under the section "Date(s) Discrimination Took Place" on his charge of discrimination, Agard listed January 2015 (as the earliest date) through June 2015 (as the latest date). Under the section outlining the particulars of the charge of discrimination, Agard stated: "Complainant alleges he was denied the positions of Director of Risk Management and Assistant Treasurer … due to his race, black. Complainant also alleges that he was terminated in June 2015 due to discrimination due to his race, black."

When pressed in his deposition for evidence that he was not hired for any particular position and was laid off because of his race, Agard could not point to specifics but rather claimed generally and nebulously that Einwalter held a discriminatory animus towards African Americans – stating, for example, "he

could sense" Einwalter was not interested in hiring a certain African American candidate and "you could tell" Einwalter did not have the same respect for African American employees.

## Standard of Review

The Court may grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex,* 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the mere existence of some alleged factual dispute. *Anderson,* 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. *Anderson,* 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. *Anderson,* 477 U.S. at 255. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Id.* at 249.

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.

In order to survive a motion for summary judgment, "the nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [her] favor based on more than mere speculation, conjecture, or fantasy.'" *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733–34 (8th Cir. 2003)) (internal quotation marks omitted).

## Discussion

Plaintiff brought this employment discrimination action alleging that he was discriminated because of his race (African American) and in retaliation for exercising his rights.  The Court has previously dismissed the retaliation claims.

See, Order dated December 7, 2016, granting Defendant's Motion to Dismiss Counts III and parts of Count IV. Plaintiff's remaining Counts are for race discrimination under 42 U.S.C. §1981 (Count I); race discrimination under Title Vii of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Count II); discrimination under Mo.Rev.Stat. § 213.055, (Count IV). Plaintiff claims that the discrimination occurred in declining to hire him as Director of Risk Management in January 2013, declining to hire him as Director of Risk Management in August 2013, declining to hire him as Director of Risk Management in January 2015, declining to hire him as Assistant Treasurer in January 2015, and laying him off during a companywide reduction in force in June 2015.

**Failure to Hire Claims**

**2013 Claims**

Defendant argues that Plaintiff's Title VII and Missouri Human Rights Act claims for the failure to hire him as Director of Risk management fail because he did not exhaust his administrative remedies in a timely manner.

In order to initiate a claim under Title VII and the MHRA a party must timely file a charge of discrimination with the administrative agency and receive a right-to-sue letter. 42 U.S.C. § 2000e–5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 109–10 (2002); *Stuart v. General Motors Corp.,* 217 F.3d 621, 630 (8th Cir.2000). Plaintiff was required to file his charge of discrimination

within 300 days of the allegedly discriminatory occurrence under Title VII and within 180 days under the MHRA. *Holland v. Sam's Club,* 487 F.3d 641, 643 (8th Cir.2007) (*citing* 42 U.S.C. § 2000e–5(e)(1) and Mo.Rev.Stat. § 213.030).

Plaintiff filed his charge of discrimination on July 15, 2015. It did not allege a continuing action such that it might cover the claims of discrimination which Plaintiff claims occurred in 2013. Plaintiff's claims are therefore time-barred.

**McDonnell-Douglas Analysis**

In order to survive a motion for summary judgment on a discrimination claim,

> a plaintiff must either present admissible evidence directly indicating unlawful discrimination, or create an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Cherry v. Siemens Healthcare Diagnostics, Inc.*, 829 F.3d 974, 976 (8th Cir. 2016). [Plaintiff]does not contend that he provided direct evidence of discrimination, and the district court proceeded under the *McDonnell Douglas* framework. Under this framework, if an employee carries his burden of establishing a prima facie case of discrimination, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* "If the employer meets this burden of production, the employee must then 'prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination.' " *Grant v. City of Blytheville, Ark.*, 841 F.3d 767, 773 (8th Cir. 2016) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

*Rooney v. Rock-Tenn Converting Co.,* No. 16-3631, 2018 WL 326049, at *3 (8th Cir. Jan. 9, 2018).

## 2015 Director of Risk Management

It is undisputed that Plaintiff did not apply for the Director of Risk Management in January 2015. The position was posted internally and externally for 6 weeks. Plaintiff's self- serving claims that his interest in the position was well known and that he was performing the duties of the director do not overcome the obligation to apply for the position. *DePriest v. Milligan*, 823 F.3d 1179, 1186 (8th Cir. 2016).

## 2015 Assistant Treasurer Position

Likewise, because Plaintiff did not apply for the Assistant Treasurer Position in January 2015, he cannot now claim he was the victim of discrimination. *See supra.*

## June 2015 Layoff

Plaintiff argues that he was discriminated against due to his race when he was laid off during the companywide reduction in force.

In order to establish a *prima facie* case of race discrimination under Title VII and Section 1981, Plaintiff first must establish a *prima facie* case of discrimination. *Jackson v. United Parcel Serv., Inc. .,* 643 F.3d 1081, 1086 (8th Cir.2011), *cert. denied,* 132 S.Ct. 1075 (2012). "To establish a prima facie case for race discrimination, a plaintiff must show (1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment

action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)." *Gibson,* 670 F.3d at 853–54 (internal quotation marks and citation omitted). If the plaintiff succeeds in establishing his prima facie case, "the defendant may rebut the prima facie case by articulating a non-discriminatory rationale for its action." *Id.* at 854 (internal quotation marks and citation omitted). Plaintiff then must prove the defendant's proffered rationale was merely pretext for discrimination, and may do so "by adducing enough admissible evidence to raise genuine doubt as to the legitimacy of [the defendant's] motive." *Id.* (internal quotation marks and citation omitted).

The MHRA similarly prohibits employers from discriminating against individuals based upon race. *See* Mo.Rev.Stat. § 213.055. "To establish a prima facie case of discrimination in the workplace, a plaintiff must show that he (1) was a member of a protected class; (2) was qualified to perform his job; (3) suffered an adverse employment action; and (4) was treated differently from a similarly situated person not a member of the protected class." *Stull v. Fireman's Fund Ins. Co.,* 2012 WL 3815647, at *6 (E.D.Mo. Sep. 4, 2012), citing *Ressler v. Clay County,* 2012 WL 2285980, at *7 (Mo.App. Jun. 19, 2012). The fourth element also may be proved by "other evidence that would give rise to an inference of

unlawful discrimination." *Ruppel v. City of Valley Park,* 318 S.W.3d 179, 185 (Mo.App.2010) (internal quotation marks and citation omitted).

The Missouri Supreme Court has determined that the MHRA may offer greater discrimination protection than that available under federal standards. *See Daugherty,* 231 S.W.3d at 818–19. Missouri courts thus no longer apply the *McDonnell Douglas* burden shifting analysis, instead applying a standard derived from Missouri's approved pattern jury instructions pursuant to which an MHRA discrimination claim survives summary judgment, "if there is a genuine issue of material fact as to whether [the protected characteristic] was a 'contributing factor' in [defendant's employment] decision." *Id.* at 820; *see also McCullough v. Commerce Bank,* 349 S.W.3d 389, 397 (Mo.App.2011). "This standard offers greater protection than the federal one because a contributing factor need only have a part in producing the [discriminatory] effect." *Stull,* 2012 WL 3815647, at *7 (internal quotation marks and citations omitted).

Plaintiff fails, however, to present his *prima facie* case because the record establishes that he was not meeting Defendant's legitimate expectations. Although Plaintiff testified that he was performing all of the duties of the director, the record clearly disputes this claim. Plaintiff's evaluation shows that his superiors had concerns regarding his productivity and lack or responsiveness. Plaintiff's feeling that his supervisor held a racial animus are insufficient to overcome the evidence

that Plaintiff's layoff was the result of companywide restructuring, particularly in light of the evidence that among other laid off employees in the Finance Department were an Asian employee and a Caucasian employee.

## Conclusion

Based upon the foregoing analysis, the record clearly establishes that there are no genuine disputes as to any material facts and that Defendant is entitled to judgment as a matter of law.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motions for Summary Judgment, [Doc No.42], is **GRANTED.**

A separate judgment in accordance with this Opinion, Memorandum and Order is entered this same date.

Dated this 19th day of January, 2018.


_____
   HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE